UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERT P.,

                              Plaintiff,

           v.

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

DECISION AND ORDER

19-CV-1287L

**PRELIMINARY STATEMENT**

        Plaintiff Robert P. ("plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and disability insurance benefits ("DIB") and for supplemental security income benefits ("SSI"). (Dkt. # 1).

        On June 24 and 27, 2015, plaintiff protectively filed applications for DIB and SSI, alleging disability beginning on June 24, 2012. (Tr. 82, 92).[1] On October 23, 2015, the Social Security Administration denied plaintiff's applications, finding that he was not disabled. (Tr. 110-25). Plaintiff requested and was granted a hearing before an administrative law judge. (Tr. 164). Administrative Law Judge Gregory Moldafsky (the "ALJ") conducted the hearing on December 5, 2017, at which plaintiff and vocational expert Jo Bates (the "VE") testified. (Tr. 31-81). In a

---

[1]  References to page numbers in the Administrative Transcript (Dkt. ## 6, 6-1, 6-2, 6-3, 6-4, 6-5, 6-6) utilize the internal Bates-stamped pagination assigned by the parties.

decision dated October 3, 2018, the ALJ found that plaintiff was not disabled and was not entitled to benefits. (Tr. 13-30). On July 25, 2019, the Appeals Council denied plaintiff's request for a review of the ALJ's decision, making the Commissioner's decision final. (Tr. 1-6). Plaintiff then commenced this action on September 20, 2019. (Dkt. # 1).

Currently pending before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. ## 10, 15). For the reasons stated below, plaintiff's motion (Dkt. # 10) is denied, and the Commissioner's motion (Dkt. # 15) is granted. Plaintiff's Complaint (Dkt. # 1), therefore, is dismissed.

## DISCUSSION

**I.     Relevant Standards**

Determination of whether a claimant is disabled within the meaning of the Act follows a well-known five-step sequential evaluation, familiarity with which is presumed. *See Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *see also* 20 C.F.R. §§ 404.1520, 416.920. The Commissioner's decision that a plaintiff is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002).

**II.    The ALJ's Decision**

Here, the ALJ applied the sequential analysis. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 24, 2012 – the alleged onset date. (Tr. 16). At step two, the ALJ determined that plaintiff had the following severe impairments: knee pain, bipolar disorder, and anxiety. (*Id.*). The ALJ also discussed several other physical impairments – hypertension and cervical radiculopathy – that he found to be nonsevere. (*Id.*). In addition, the

ALJ noted that plaintiff's history of substance abuse was not a contributing factor material to the disability determination. (Tr. 16-17). At step three, the ALJ concluded that plaintiff's impairments, alone or in combination, did not meet or medically equal a listed impairment in Appendix 1 to Subpart P of Part 404 of the relevant regulations (the "Listings"). (Tr. 17-18).

The ALJ then determined that plaintiff retained the RFC to perform medium work, with certain limitations. (Tr. 18). Specifically, the ALJ limited plaintiff to: frequent climbing of ramps and stairs; occasional climbing of ladders, ropes, and scaffolds; frequent stooping; occasional crouching, kneeling and crawling; no unprotected heights; unskilled, routine, repetitive tasks in a work environment that is not fast paced or has strict production quotas; incidental interaction with the public and occasional interaction with co-workers and supervisors; jobs where changes in work setting or processes are few, if any, and any changes are explained in advance. (*Id.*).

At step four, the ALJ found that plaintiff could not perform any of his past relevant work as a janitor or press person. (Tr. 24). Finally, at step five, the ALJ determined that based on the VE's testimony and plaintiff's RFC, age, education, and work experience, plaintiff could perform other occupations existing in significant numbers in the national economy, specifically, linen room attendant, day worker, and laundry worker. (Tr. 24-25). Accordingly, the ALJ concluded that plaintiff was not disabled under the Act. (Tr. 25).

## III.  Plaintiff's Contentions

Plaintiff challenges the ALJ's disability finding for two separate reasons, both of which relate to the ALJ's consideration of plaintiff's mental impairments. (Dkt. # 10-1; Dkt. # 18).[2] First, he contends that the ALJ failed to weigh the opinion of consultative psychologist Dr. Susan

---

[2] Plaintiff's contentions relate only to the mental aspect of the ALJ's RFC determination. Therefore, I address only the mental portion of the RFC. *See, e.g.*, *Coleman v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 389, 394 n.3 (W.D.N.Y. 2018) ("[p]laintiff challenges only those portions of his RFC relating to his mental limitations[;] . . . [a]ccordingly, this [d]ecision and [o]rder addresses the RFC only as it pertains to [p]laintiff's mental limitations").

Santarpia, PhD ("Dr. Santarpia"), and rejected the other medical opinions relating to plaintiff's mental impairments. In plaintiff's view, the mental portion of the ALJ's RFC determination is thus based on the ALJ's lay interpretation of the medical evidence and unsupported by substantial evidence. (Dkt. # 10-1 at 12-15). Second, plaintiff maintains that the medical opinions relating to plaintiff's mental impairments were rendered stale by his subsequent and multiple hospitalizations and deteriorating mental health condition. Plaintiff argues that the ALJ should have ordered an updated consultative examination of plaintiff's mental health condition in light of this evidence, and that he failed to properly develop the record as a result. (Dkt. # 10-1 at 15-17; Dkt. # 18 at 1-4). Neither of plaintiff's arguments is persuasive on this record.

## IV. Analysis

### 1. The ALJ Did Not Err in Considering the Opinion Evidence

I turn first to plaintiff's contention that the mental portion of the ALJ's RFC determination is not supported by substantial evidence because he failed to weigh Dr. Santarpia's consultative opinion and rejected the other opinion evidence relating to plaintiff's mental impairments. Plaintiff thus maintains that the RFC determination is not grounded in opinion evidence, but rather the product of the ALJ's lay interpretation of the medical record. (Dkt. # 10-1 at 12-15). I disagree.

Initially, plaintiff correctly points out that the ALJ did not explicitly assign Dr. Santarpia's opinion any weight. (Tr. 23-24). Yet "it is well-established that the failure to explicitly assign weight to an opinion is harmless in certain situations, such as where the ALJ's decision reflects that the opinion was considered or where the limitations assessed in the opinion are ultimately accounted for in the RFC." *Swain v. Colvin*, 2017 WL 2472224, *3 (W.D.N.Y. 2017) (quotation

omitted). For the following reasons, I find that the ALJ's failure to assign weight to Dr. Santarpia's opinion was at most harmless error.

On September 28, 2015, plaintiff underwent a consultative psychiatric evaluation conducted by Dr. Santarpia. (Tr. 723-26). At the time of the examination, plaintiff was 53 years old and was not employed. (Tr. 723). He had taken public transportation to the examination. (*Id.*). He reported that he had graduated from high school, throughout which he was placed in a regular education setting. (*Id.*). Plaintiff also indicated that he had a history with psychiatric issues: he had previously been diagnosed with depression and possible bipolar disorder; had been hospitalized four times for issues in 2002, 2003, 2004, and 2005; and had received outpatient treatment through various providers during those years. (*Id.*). He denied counseling treatment at the time of the examination, however, and received psychotropic medication through his primary care physician. (*Id.*).

Plaintiff told Dr. Santarpia that he woke up during sleep nightly, but that his appetite was normal. (*Id.*). He reported depressive symptomology, specifically, dysphoric mood, crying spells, hopelessness, and loss of interest, but that his medication seemed to help. (*Id.*). He also reported anxiety-related symptoms, such as apprehension and worry, restlessness to the point of feeling panicky, and manic symptomology, such as talkative pressured speech and flight of ideas. (Tr. 724). Plaintiff stated that he could dress, bathe, and groom himself, as well as cook, clean, do laundry, shop, and manage his money. (Tr. 725). He had an operator's license for a motor vehicle, socialized with his family and friends, attended AA meetings, and spent his days watching television. (*Id.*).

On mental status examination, Dr. Santarpia observed that plaintiff's demeanor and responsiveness were cooperative, and his manner of relating and overall presentation were

adequate. (Tr. 724). He was well-groomed, had normal posture and motor behavior, and his eye contact was appropriate. (*Id.*). His thought process was clear and goal oriented, yet his affect and mood were dysphoric. (Tr. 724-25). Plaintiff was also fully oriented, had intact attention and concentration, as well as intact recent and remote memory skills. (Tr. 725). Dr. Santarpia estimated that plaintiff's cognitive functioning level was average, and that his insight and judgment were fair. (*Id.*).

Dr. Santarpia ultimately diagnosed plaintiff with other specified bipolar disorder, generalized anxiety disorder, and cannabis, alcohol, and heroin dependence abuse in sustained remission, and noted that his prognosis was guarded. (Tr. 726). She also opined that plaintiff was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, and appropriately deal with stress within normal limits. (Tr. 725). Plaintiff was, in Dr. Santarpia's view, moderately limited in learning new tasks, performing complex tasks independently, making appropriate decisions, and relating adequately with others, difficulties caused by stressors and plaintiff's living arrangement at the time of his examination. (*Id.*).

A review of the ALJ's decision plainly demonstrates that he considered and explained Dr. Santarpia's opinion throughout his decision. (Tr. 17-18, 21-23). The ALJ repeatedly relied on Dr. Santarpia's examination results at step three when evaluating whether plaintiff's mental impairments met a listed impairment. (Tr. 17-18). He also thoroughly detailed the opinion when discussing the medical evidence in the RFC portion of the opinion. (Tr. 21). In addition, when weighing the opinion evidence of record, the ALJ explicitly and accurately recited Dr. Santarpia's medical source statement, and in fact measured other opinion evidence against Dr. Santarpia's

opinion. (*See* Tr. 23 (finding non-examining state agency expert's opinion "somewhat inconsistent with Dr. Santarpia's functional capacity report")).

Moreover, and perhaps more importantly, the mental portion of the ALJ's RFC determination accounted for and is consistent with Dr. Santarpia's opined limitations. Specifically, Dr. Santarpia opined that plaintiff had a "moderate impairment" learning new tasks, performing complex tasks independently, making appropriate decisions, and relating adequately with others. (Tr. 725). The ALJ adequately accommodated each of these limitations in his RFC determination by restricting plaintiff to work that, among other things, was unskilled, routine, and repetitive, involved only incidental interaction with the public and occasional interaction with co-workers and supervisors, and had few, if any, changes in the work setting, where any changes would be explained in advance. (Tr. 18).

Therefore, the ALJ's failure to explicitly assign weight to Dr. Santarpia's opinion is at most harmless error; the ALJ was clearly aware of this opinion, as he discussed it throughout his decision, and his RFC determination is in accord with the limitations opined by Dr. Santarpia. *See, e.g.*, *Hamilton v. Astrue*, 2013 WL 5474210, *16 (W.D.N.Y. 2013) (ALJ's failure to assign weight to consultative opinion and functional assessment completed by health provider constituted harmless error where ALJ "provided a summary of both [opinions] and specifically referred to the corresponding exhibits in his decision," and where the opinions were consistent with and supportive of the ALJ's RFC determination) (collection cases).

Furthermore, I disagree with plaintiff that the mental portion of the ALJ's RFC determination is not supported by medical opinion evidence. As discussed above, the ALJ's determination accounts for and is consistent with Dr. Santarpia's opinion. In addition, the ALJ's

RFC determination is reasonably consistent with the September 14, 2015 opinion of Nurse Leslie Bixby, FNP-BC ("Nurse Bixby"). (Tr. 1887-88).

Nurse Bixby noted that plaintiff's medical problems included depression, bipolar disorder, and panic attacks, for which plaintiff was taking medication, but which Nurse Bixby opined were permanent problems. (Tr. 1887). She further opined that plaintiff had several associated mental functioning limitations; specifically, plaintiff was moderately limited understanding and remembering instructions, carrying out instructions, maintaining attention and concentration, and maintaining socially appropriate behavior without exhibiting behavior extremes, and was very limited in his ability to function in a work setting at a consistent pace. (Tr. 1888). The ALJ considered this opinion and assigned it "no more than partial weight," observing that while Nurse Bixby was not an acceptable medical source and parts of her opinion were inconsistent with other evidence in the record, the ALJ still "concur[red] that [plaintiff] ha[d] moderate limitations in some areas." (Tr. 23-24).

Despite assigning this opinion limited weight, the ALJ adequately accommodated for certain of Nurse Bixby's opined limitations. Again, the ALJ limited plaintiff to, among other things, unskilled, simple, and routine tasks performed in an environment that was "not fast paced or ha[d] strict production quotas," and one in which plaintiff's interaction with others was limited. (Tr. 18). These limitations are consistent with Nurse Bixby's opinion.

In short, I do not agree with plaintiff that the mental portion of the ALJ's RFC determination was based on his lay interpretation of the medical evidence; regardless of the weight assigned (or not assigned) to the opinion evidence, the ALJ in fact accounted for the limitations associated with plaintiff's mental impairments that were reflected in the opinion evidence. Remand is thus not warranted on this basis.

### 2. Dr. Santarpia's Opinion Was Not Stale

Plaintiff also contends that Dr. Santarpia's opinion was stale and that the ALJ failed to adequately develop the record. In plaintiff's view, the evidence post-dating Dr. Santarpia's examination in 2015 demonstrates that his mental condition significantly deteriorated. According to plaintiff, the ALJ should have ordered an updated consultative examination regarding plaintiff's deteriorated mental condition. (Dkt. # 10-1 at 15-17; Dkt. # 18 at 1-4). Again, I disagree.

True, "an ALJ should not rely on 'stale' opinions – that is, opinions rendered before some significant development in the claimant's medical history," *Robinson v. Berryhill*, 2018 WL 4442267, *4 (W.D.N.Y. 2018), and "[m]edical source opinions that are stale and based on an incomplete medical record may not be substantial evidence to support an ALJ['s] finding," *Davis v. Berryhill*, 2018 WL 1250019, *3 (W.D.N.Y. 2018) (alterations, citations, and quotations omitted). But "a medical opinion is [not] stale merely because it pre-dates other evidence in the record, where . . . the subsequent evidence does not undermine [the opinion evidence]." *Hernandez v. Colvin*, 2017 WL 2224197, *9 (W.D.N.Y. 2017). *Accord Pritchett v. Berryhill*, 2018 WL 3045096, *8 (W.D.N.Y. 2018) (noting that a "medical opinion based on only part of the administrative record may still be given weight if the medical evidence falling chronologically before and after the opinion demonstrates 'substantially similar limitations and findings'") (citation omitted).

Following Dr. Santarpia's September 28, 2015 examination, it is clear that plaintiff underwent several hospitalizations due to substance abuse issues, particularly withdrawal symptoms and relapses, all of which the ALJ discussed. (Tr. 13, 21-22).

Specifically, on April 13, 2016, plaintiff voluntarily presented to the emergency department at Erie County Medical Center ("ECMC") after reporting that he had "drank a bottle

9

of mouthwash." (Tr. 833). Plaintiff believed that he was going through withdrawal symptoms and requested "detox." (*Id.*). On examination, plaintiff appeared well-developed and well-nourished, he was fully alert and oriented and was cooperative, and had appropriate judgment, insight, mood, and affect. (Tr. 834, 839). Plaintiff was admitted to the hospital for inpatient detoxification "after his withdrawal symptoms . . . subsided." (Tr. 829). Plaintiff was discharged on April 20, 2016, at which time it was reported that he had had methadone/benzodiazepine and alcohol withdrawal and that he could resume day-to-day activities as tolerated. (Tr. 829, 831).

Several months later, on August 29, 2016, plaintiff again voluntarily presented to ECMC for withdrawal symptoms, after he stopped taking methadone and benzodiazepine, and started consuming alcohol. (Tr. 822). At the time of his initial presentation, he was "mostly cooperative," but was also "mildly irritable at times" and had withdrawal symptoms, such as high levels of anxiety and recent difficulty sleeping. (*Id.*). Providers noted that he "had a similar presentation in April 2016," and that plaintiff "had an extensive inpatient detox history spanning between 2005 and 2012, as well as [an] inpatient psychiatric admissions for depression in 2005." (*Id.*). Plaintiff did not have any suicidal ideations at the time he presented to ECMC, nor did he appear to be "acutely psychotic" or to be experiencing "acute depressive or manic episodes." (Tr. 822-23).

Plaintiff did demonstrate several abnormal findings on mental status examination. For example, he was guarded and irritable, appeared older than his stated age, had poor hygiene, and had restricted affect. (Tr. 824). Yet he was also "stable" from a "psychiatric standpoint," was calm, and demonstrated good behavioral control. (Tr. 825). Moreover, he did not meet the criteria from "inpatient psychiatric admission." (Tr. 823). Plaintiff could also "understand the risks and benefits of his behavior, and [was] able to describe that he would like to go into detox." (Tr. 827).

Ultimately, plaintiff was admitted for substance intervention services, and was discharged on September 3, 2016. (Tr. 816, 827). At that time, his discharge diagnosis was alcohol use and opiate use disorder, but he was not having any withdrawal symptoms. (Tr. 816, 820). He also had "normal mental status." (Tr. 820).

Several days following his September 3, 2016 discharge, plaintiff presented to ECMC on September 8 and 11, 2016. (Tr. 805, 811). On September 8, plaintiff was again experiencing withdrawal symptoms from methadone and reported anxiety. (Tr. 811). But on examination, plaintiff appeared in no acute distress, was fully alert and oriented, had appropriate appearance, judgment, and insight, and had normal mood and affect. (Tr. 812). He was discharged that day in good condition and with no activity restrictions. (Tr. 814-15).

On September 11, 2016, plaintiff presented with complaints of alcohol and benzodiazepine relapse and requested further detoxification. (Tr. 805). While he was anxious, had rapid speech, and was "rather circumstantial and tangential and hard to follow at times" (Tr. 805), his mental status examination revealed largely normal results (Tr. 806). Providers also detected the presence of amphetamine in plaintiff's urine. (Tr. 805). Plaintiff was diagnosed with adjustment disorder with anxiety and was not admitted to the hospital. (Tr. 805, 807).

On June 6, 2017, plaintiff was again admitted to ECMC, this time for "possible overdose" of benzodiazepine. (Tr. 789, 796). Plaintiff reported that he had taken three tablets of Klonopin because he had been "feeling anxious, dealing with issues with his relationship as well as money problems." (Tr. 796).[3] Plaintiff was "acutely intoxicated," and demonstrated limited judgment, impaired recent memory, yet intact remote memory. (Tr. 791, 793). He also was alert and fully oriented on examination but had slurred speech. (Tr. 797). Plaintiff was discharged on June 12,

---

[3] Notably, a June 1, 2017 ECMC treatment note (five days prior to plaintiff's possible overdose) indicated that plaintiff was "going [through] a lot right now," and in the process of "ending a 9-year relationship with his wife." (Tr. 772).

11

2017 in stable condition. (Tr. 783). At that time, he denied any anxiety, had no withdrawal symptoms, and had "normal mental status." (Tr. 784). Once again, plaintiff could resume day-to-day activities as tolerated. (Tr. 787).

The pertinent question now is whether this history of intermittent relapse issues and hospitalizations throughout parts of 2016 and 2017 undermined Dr. Santarpia's 2015 examination and rendered her opinion stale. On the facts of this case, I find that it did not.

Initially, as the ALJ noted, the record demonstrates that plaintiff's substance abuse issues were not confined to the period post-dating Dr. Santarpia's examination. Specifically, while Dr. Santarpia indicated in September 2015 that plaintiff's substance abuse issues had been in "sustained remission" (Tr. 726), on September 13, 2012, plaintiff was admitted to ECMC for several days due to alcohol/opiate withdrawal. (Tr. 1135). That ECMC treatment note also indicated that plaintiff had had "multiple admissions (13) for alcohol and opiate abuse and withdrawal," with his last admission coming just days prior on September 9, 2012 for "opiate and alcohol abuse." (*Id.*). As with his admissions years later in 2016 and 2017, plaintiff presented to ECMC in 2012 with anxiety symptoms, but had normal judgment and insight, and was fully oriented. (Tr. 1136). Plaintiff's relapse and withdrawal issues thus were not new when they occurred in 2016 and 2017.

Moreover, and critically, plaintiff has not pointed to anything, aside from the mere fact that he was admitted to the hospital for substance issues, suggesting that his mental condition substantially deteriorated beyond what Dr. Santarpia observed or was aware of. As discussed above, ECMC treatment notes from plaintiff's hospitalizations in 2016 and 2017 noted that his withdrawal symptoms included, among other things, heightened anxiety, sleeping problems, and rapid speech. Significantly, plaintiff reported similar issues to Dr. Santarpia. (*See* Tr. 723-34

(noting that plaintiff experienced waking nightly, and presented with anxiety-related symptoms, as well as talkative pressured speech and flight of ideas)).

In addition, plaintiff's mental status examinations during his hospitalizations were consistently unremarkable (aside from his withdrawal symptoms), in that he often presented fully alert and oriented, was cooperative and in an appropriate mood, and exhibited appropriate insight and judgment.  Providers noted that plaintiff did not have suicidal ideations, and even appeared in "stable" psychiatric condition.  Furthermore, each time plaintiff was discharged, he was in good condition – "normal mental status" – with no functional restrictions or limitations.

Thus, while plaintiff undoubtedly struggled with substance abuse issues throughout the relevant time frame, in my view, the above records do not demonstrate that his mental condition significantly deteriorated after Dr. Santarpia's examination, such that her opinion was rendered stale or unreliable.  The ALJ was, therefore, entitled to rely on Dr. Santarpia's opinion in reaching the mental portion of the RFC determination, which, for reasons explained above, is support by substantial evidence.  Accordingly, the ALJ was not required to order an updated consultative examination.  Remand is thus not warranted on this basis.

## CONCLUSION

For the forgoing reasons, I find that the ALJ's decision was supported by substantial evidence and was not based on legal error.  Plaintiff's motion for judgment on the pleadings (Dkt. # 10) is **DENIED**, the Commissioner's motion for judgment on the pleadings (Dkt. # 15) is **GRANTED**, and the Commissioner's decision that plaintiff is not disabled is affirmed in its

entirety.  Plaintiff's Complaint (Dkt. # 1) is **DISMISSED with prejudice**.  The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated:  Rochester, New York
        March 3, 2021.